WYLIE-STEWART MACHINERY CO. v. THOMAS.

No. 30109. March 2, 1943.

Rehearing Denied May 25, 1943.

*137 P. 2d 556.*

Ames, Monnet, Hayes & Brown, of Oklahoma City, for plaintiff in error.

Joe C. Looney, of Wewoka, for defendant in error.

BAYLESS, J. Wylie-Stewart Machinery Company, a corporation, appeals from the judgment of the district court of Seminole county, based on the verdict of a jury, in favor of Phillip T. Thomas for damages for personal injuries suffered by Thomas as a result of the negligence of Albert Jones, under the rule of respondeat superior.

The State of Oklahoma, through its highway department, in conjunction with the United States Government, acting through WPA, was doing certain road work. Under this contract, state was required to furnish certain machinery. The state entered into a contract, evidenced by certain writings, with company whereby company was to furnish to state for a specified number of hours, at a stated hourly rate of pay, a power-driven shovel and an operator therefor. In keeping with this contract company sent a shovel at state's direction to the job and sent Jones to operate the shovel under the following instructions:

"He told me to go out there and do what they wanted done, that they had a man there to tell me what they wanted to do, but not to tear up the shovel, to use my judgment about whether I was injuring the shovel or not."

Company was to pay his wages, as the operator's wages were included in the hourly rate. State then put the shovel and operator to work on the WPA project.

WPA had a general superintendent on the project, who had general control. The state had a foreman on the project, one Buster, who was in charge of the shovel and trucks for loading purposes.

Thomas was the owner and operator of a truck, and the action proceeded on the theory he was an independent contractor; and that not being an employee he did not come under the Workmen's Compensation Act.

Thomas had driven his truck to a spot near the shovel, indicated by Buster, and Jones dumped a load of rock from the shovel into Thomas' truck. Jones then swung the shovel over the cab of Thomas' truck and a rock, which had lodged in the shovel, fell through the cab and struck and injured Thomas.

The negligence of Jones, as stated in the petition and shown by the evidence, consisted of (1) moving the shovel over the cab or front end of Thomas' truck, and (2) so moving the shovel before it was completely emptied or while it had a heavy rock in it. The evidence clearly shows these two things were done by Jones, and since no contention is made that they were not acts of negligence, we assume they were and pass on to the issue argued.

The issue argued by company is governed by the "loaned servant" rule. 35 Am. Jur. 455, § 18; and 29 C. J. 36, § 5. Company states its position thus:

"At the time of plaintiff's injury, Albert Jones, although in the general employ of defendant, was the servant of the State Highway Commission, his special master, and defendant is not liable for his negligence, if any."

Thomas restricts his presentation to this one issue, and we now consider the cases cited.

This question of law has been considered earlier by this court, New v. McMillan, 79 Okla. 70, 191 P. 160; Aderhold v. Bishop, 94 Okla. 203, 221 P. 752; City of Tulsa v. Randall, 174 Okla. 630, 52 P. 2d 33; Thomas v. Great Western Mining Co., 150 Okla. 212, 1 P. 2d 165; Palmer v. Skelly Oil Co., 129 Okla. 32, 263 P. 440, and Randolph v. Oklahoma City General Hospital, 180 Okla. 513, 71 P. 2d 607. The authorities generally, and this court in particular, have recognized that a servant may be loaned by the master to a third person to perform services for the third per-

son, and to an extent the servant may assume a relationship to the borrowing master that overshadows and in many respects delimits the relationship to the lending master. It is recognized that acts of negligence committted by the servant while in the service of the borrowing master may not serve to render the lending master responsible under the rule of respondeat superior. But as to the case with so many principles of law, the difficulty of applying them arises from the varying fact situations.

We have not been cited and we have not found a decision from any state that says that a servant cannot be loaned to another, nor that holds that the lending master is not thereby relieved in some instances of responsibility for the negligence of the servant while in the employ of the other.

However, there are decisions from states that read literally would negative that principle. For instance, it is said that (1) unless the lending master surrenders all control, and (2) unless the servant renounces all obedience to the master who hired and loaned him, and (3) unless the lending master surrenders the power to discharge the employee and the borrowing master has the power to discharge the servant from both employments, there is no release of the hiring master from responsibility for the servant's negligence under the rule of respondeat superior. The cases cited by Thomas apply these tests. Bartolomeo v. Charles Bennett Contracting Co., 245 N.Y. 66, 156 N.E. 98, and other New York cases; Scrimsher v. Reliance Rock Co., 116 Cal. App. 500, 2 P. 2d 862, and other California cases; and Chamberlain v. Lee, 148 Tenn. 637, 257 S.W. 415.

To us, when the principle is tested by the elements stated above, the result is the destruction of the principle. When a master turns an employee to another's service under the tests outlined, it is not a loan of the servant, it is a complete giving up of the servant, a termination of any relationship between the hiring master and the servant. It would be an out and out change of employment. It would be a discharge from one master and a hiring by another.

There is a line of cases wherein the hiring master, the one who lends, is regarded as the general master, and the master who borrows the servant is regarded as the special master, and the responsibility of both or either for the acts of negligence of the servant is judged by the nature of the duty being performed by the servant at the time, and which of the two masters is exercising control. Company cites and relies on this line of cases. Thomas v. Great Western Mining Co., supra; Devaney v. Lawler Corporation, 101 Mont. 579, 56 P. 2d 746, Steele v. Wells (Tex. Civ. App.) 134 S.W. 2d 377; and Shapiro v. City, 212 N. C. 751, 194 S.E. 479. This rule is well stated in the editorial headnotes to the annotation appearing in 136 A.L.R. 525, as follows:

"Generally, the fact that a person is the general servant of one employer does not, as a matter of law, prevent him from becoming the particular servant of another, who may be held liable for his acts; and, as a general proposition, if one person lends his servant to another for a particular employment, the servant, for anything done in that employment, is regarded as the servant of the one to whom he has been lent, although he remains the general servant of the person who lent him. An employer is not liable for injury negligently caused by a servant if the latter is not at the time in the service of the employer, but in the special service of another, although the question of liability is ultimately dependent upon the determination of who has the power to control and direct at the exact time of the act in question. In other words, in determining whether, in respect of a particular act, a servant, in the general employment of one person, who has been loaned for the time being to another, is the servant of the original employer or of the person to whom he has been loaned, the test is whether, in the particular service which he is engaged to perform, the servant continues liable to the direction and control of his general employer or becomes subject to that of the person to whom

he is lent—whether the latter is in control as proprietor so that he can at any time stop or continue the work and determine the way in which it is to be done, with reference not only to the result reached but to the method of reaching it. The mere fact that the general employer continues to pay the wages of the wrongdoer will not make him liable for the wrongful act where it appears that the person to whom he was lent controls him entirely in regard to the work to be done."

The last-cited cases announce the rule that is generally applied in this state, although there is some language in our decision in New v. McMillan, supra, which is quoted in some of the later cases that Thomas cites and contends support him. Upon reading that decision, it will appear that this language is used concurrently with language to the contrary which would make it appear that the two were used as being synonymous. Actually, neither rule was applied in the New Case, since it turned wholly on a question of fact of whether there had been a loan in the first instance. In that case Ben McMillan, the deceased, was employed by a railroad company, which company had contracted with another company to construct a coal chute for it. At the scene of the construction, the railroad company's roundhouse foreman and certain of its employees (including McMillan) were present as well as the man in charge for the construction company and perhaps certain of its employees. In the course of the work the foreman for the construction company requested the foreman for the railroad company to send a man to aid one of his employees, whereupon the railway company's foreman sent Joe McMillan, a brother of the deceased, to furnish the assistance. There is a dispute in the evidence whether the railroad company's foreman directed Ben McMillan also to assist. In any event Ben McMillan did assist and was killed. In that case the prime issue was whether Ben McMillan was employed by the railroad company or temporarily by the construction company at the time of his death. The effect of the jury's verdict was to find that he was employed by the railroad company. We think evidence clearly supported that finding. The language used in our decision is useful as laying down the test of when the facts show that a servant has or has not been loaned. In the case before us, there is no such issue, for it stands admitted or is conclusively proven that the hirer, the borrower, and the servant all knew and understood that the servant was loaned by the hirer to the borrower. Thus the discussion in the New Case loses much of its pertinency to the issues in this case. We are also cited our decision in Palmer v. Skelly Oil Co., supra, wherein the issue was identical with that in the New Case, that is, whether there actually had been a lending of a servant.

In this case it stands admitted that the defendant, that is, the hiring master, undoubtedly retained a relationship to the loaned employee, and it could have withdrawn him from this work and have sent another employee in his stead, and it could have, for its own reasons or upon complaint of WPA or the State Highway Department, discharged this man for sufficient reasons. It also paid him his wages.

Yet, insofar as the performance of specific duties as assigned to the servant by WPA and the State Highway Department, the hirer had no control or supervision.

The borrower had no power to discharge the employee from the service of the company, although it is obvious that if his services were unsatisfactory, the borrower could have complained to the lender and thus have obtained a satisfactory employee, just as it could have done had the power-driven shovel proved unsatisfactory. The borrower certainly had enough control to oust the servant from its service, if the servant's service was not satisfactory, whereupon the servant would return to the unconditional service of his hirer.

We pass now to a discussion of the evidence relating to the injury. It is not in conflict on any material point.

Company had no agent at the scene to superintend or give directions. WPA had a general superintendent, who while describing the control as co-operative seems not to have exercised any detailed or immediate superintendence of the duties of the shovel and truck or the operators thereof. State's agent, Buster, performed the duty of immediate superintendence, and the operator of the shovel and the drivers of the trucks took orders from him. His testimony shows he exercised close control of this, giving orders as to the position of the shovel, its procedure for loading the trucks, and he specifically directed the route and routine of the trucks as they approached the shovel to be loaded. He testified he gave his directions by hand signs. In this particular instance, owing to the way the rock had been dynamited and the manner in which it lay, it was necessary to place the shovel in a position with respect to the rock to be shoveled and the trucks that had not been theretofore used; and it was necessary to have the trucks approach the shovel in a position not theretofore used and not as safe or desirable as the other approach; and Buster had been taking extra precautions when having the loaded and emptied shovel moved over the trucks. This one instance appears to have been the only instance where the unloaded shovel was swung over the cab, and Buster testified that Jones violated his (Buster's) instructions when he did so.

It will appear from the annotation in 136 A.L.R. 525 that there are several cases involving this and other issues arising out of acts involving the responsibility of parties bearing the general relationship we have here. It will appear from these cases that the decisions of the courts are in conflict on this issue, and the decisions which we have mentioned above, cited by Thomas as supporting his contention, have been criticised by us and our reason for not applying them has been given. We have considered the decision in McFarland v. Dixie Machinery & Equipment Co., 348 Mo. 341, 153 S. W. 2d 67, 136 A.L.R.

516. We consider the fact situation there so nearly similar to the one before us, and the reasons given by the Supreme Court of Missouri, for applying a rule so similar to the one we generally apply, so sound that we feel the analogy between the two cases is almost perfect. In the McFarland Case, the city of Kansas City had an arrangement with WPA substantially similar to the arrangement which the State Highway Department had with WPA in this instance. Kansas City, in order to comply with its part of the agreement, as State Highway Department did in this case, hired a piece of power-driven machinery on an hourly or daily basis and loaned it or put it to service of WPA. As in this case, the machinery company furnished an employee to operate the machine and paid his wages. In the matter of directing the employee what to do, the machinery company in the Missouri case gave its employee almost identical instructions with those given in this case, to wit:

"To do whatever they wanted him to do with that equipment while he was out there, outside of jeopardizing the machine itself, like running in the river, which they did a few times."

It will be recalled that in this case the instructions given the servant by the hirer were to do whatever they told him to do, so long as they did not injure the machinery. In the Missouri case a third person was injured when he stepped upon the rear of the machine for the purpose of using his foot to "stomp" a drawbar pin in place. The servant was driving the machine at the time and apparently acquiesced in the third person's intention to step on the pin. We desire to quote rather extensively from the opinion in the Missouri case.

"It is not contended that Whalen was, at the time of plaintiff's injury, the servant of two joint masters. It has been said that 'it is a doctrine as old as the Bible itself, and the common law of the land follows it, that a man cannot serve two masters at the same time; he will obey the one, and betray the

510

other;' and that 'he cannot be subject to two controlling forces which may at the same time be divergent.' Atwood v. Chicago, R. I. & P. R. Co. (C.C.) 72 F. 447, loc. cit. 455. Although there may be joint employment, and also acts for which more than one employer may be liable (Standard Oil Co. v. Anderson, 212 U.S. 215, loc. cit. 222, 29 S. Ct. 252, 53 L. Ed. 480; Restatement of Agency, sections 226, 227), nevertheless there is no several liability of two persons (not acting jointly) *as separate masters* of a single servant for the same act. The basis for liability of a person, other than the actual master, is usually his personal participation in some form in the servant's act, as will appear from the situations shown in the above-cited authorities. The question here is: Was there sufficient substantial evidence for the jury to find (if it disregarded all evidence to the contrary) that defendant was Whalen's master as to the work in which plaintiff was injured? While we quoted the testimony of WPA officers, who were defendant's witnesses, we do not deem it to be in conflict with the facts shown by plaintiff's evidence as to what was actually done.

"Obviously, the facts in this case present a borrowed servant problem in an unusually complicated situation. Neither the WPA nor the city employed defendant to obtain a certain result; neither did defendant have anything to say about what work Whalen was to do. The city rented the tractor with a driver furnished, from defendant and then lent both to the WPA. (For a double rental truck and driver case see Wagner v. Motor Truck Renting Corp., 234 N. Y. 31, 136 N. E. 229.) Our precedents have always ruled the question of who is the master or employer, to whom the rule of respondeat superior is to be applied, principally upon the test of control . . .

"In a recent article (Scope of the Business: The Borrowed Servant Problem, 38 Mich. Law Rev. 1222), which is a very helpful review of cases from any jurisdictions, Professor Talbot Smith, University of Missouri Law School, suggests a further test (criticising both the 'control test' and 'whose business test' as inadequate) called 'scope of the business' analogous to 'scope of employment' used in determining the liability for acts of admitted servants. That is to 'ask whether or not the questioned act (the servant's act causing damage) was within the normal scope of the business of the borrower of the servant'; and that 'if the act of the borrowed servant was within the normal scope of the business of the borrowing employer, and there has not been, in fact and in good faith, a permissible farming out (of this part of the borrowing employer's business to the borrowed servant's general employer as an independent contractor), such borrowing employer should be liable.' The American Law Institute's Restatement of Agency (section 227) states the rule as follows: 'A servant directed or permitted by his master to perform services for another may become the servant of such other in performing the services. He may become the other's servant as to some acts and not as to others.' It is also said, in comment: 'Whether or not the person lent or rented becomes the servant of the one whose immediate purpose he serves depends in general upon the factors stated in Sec. 220 (2).' This section would consider all of these tests as factors (under subdivision (a) is 'the extent of control' and (h) apparently covers Professor Smith's test 'whether or not the work is part of the regular business of the employer).' It is true, as Professor Smith also points out, that 'every borrowed servant case involves *some severance of employment* as far as the original, lending, employer is concerned, and the matter is purely one of degree.' (Does not that really mean severance and transfer of some part of the right to direct?) It, therefore, seems logical that all of the factors, enumerated in section 220 (a), should be considered to determine the degree or extent of such severance and transfer; and that the ultimate basis of decision, between the general and special employer, as to who is the master on a particular occasion, must be the degree or extent of such severance and transfer in the specific situation. Whether the borrowed employee is doing something within the normal scope of special employer's business is certainly a most important factor in determining the degree of severance and transfer; but so is the matter of who is exercising or may exercise the *right of control* in directing the details of his physical ac-

tivities therein. Full control to do so may be surrendered by the general employer and assumed by the special employer, as to particular work, without completely or permanently severing the general employment as to other matters.

"The proposition is thus stated in the Restatement in Comment upon section 227:

" 'Since the question of liability is always raised because of some specific act done, the important question is not whether or not he remains the servant of the general employer as to matters generally, but whether or not, as to the act in question, he is acting *in the business of and under the direction of* one or the other. It is not conclusive that in practice he would be likely to obey the directions of the general employer in case of conflict of orders. The question is as to whether it is understood between him and his employers that he is to remain in the allegiance of the first as to a specific act, or is to be employed *in the business of and subject to the direction of* the temporary employer as to the details of such act. This is a question of fact in each case.' " (Our emphasis.)

We feel that the discussion quoted is a comprehensive statement of the reason supporting the rule which we desire to apply in this case, and for that reason have quoted it at greater length than is customary.

We are of the opinion that the act of negligence, that is, the moving of the supposed unladen shovel over the cab of Thomas' truck, in violation of Buster's instructions, was in the course of the performance of a duty for the state and federal governments, under their direct and immediate supervision and control, and that this act was not done for company nor under its supervision and control within the meaning of the loaned servant rule. Therefore, company was not liable.

The judgment of the trial court is reversed and the cause is remanded.

GIBSON, V. C. J., and RILEY, OSBORN, and WELCH, JJ., concur. CORN, C.J., and HURST, DAVISON, and ARNOLD, JJ., dissent.

HURST, J. (dissenting). The determination as to liability for the acts of the servant under the loaned servant rule requires a consideration of many different factors. Practically every case presents facts peculiar to itself. Therefore, the determination must be governed by legal principles more than by the result reached in particular cases. The ultimate question is, "In whose business was the servant engaged?" Braxton v. Mendelson, 233 N. Y. 122, 135 N. E. 198. This question is to be determined as of the exact time of the negligent or wrongful act complained of. 35 Am. Jur. 970. And the question is to be determined by deciding who has the control of the servant. The original employer is not absolved from liability unless he has surrendered *complete* control to the one to whom the servant is furnished. City of Tulsa v. Randall, 174 Okla. 630, 52 P. 2d 33; Randolph v. Oklahoma City General Hospital, 180 Okla. 513, 71 P. 2d 607; 18 R. C. L. 784. The question is generally one of fact for the trier of the facts. It becomes one of law only when all reasonable men would agree that but one conclusion could be reached.

The factors to be considered here are these: The defendant had the sole right to hire and fire the operator of the machine; it paid his wages; the machine was a valuable one requiring a skilled mechanic to operate it; its proper care and handling were matters of concern to the defendant; the operator, Jones, was instructed by the defendant in co-operating with the Highway Department "not to tear up the shovel" and to use his own judgment "about whether it was injuring the shovel or not"; the operator owed a duty to co-operate with the superintendent of the Highway Department, but in doing so he owed a continuing and ever present duty to the defendant to so handle the machine as to protect it from damage; the duty to protect the machine cannot be dissociated from the duty to co-operate with the Highway Department in performing the work; each time the superintendent gave him directions, it was his duty to determine whether the ma-

chine would probably be damaged by carrying out the directions, and if he thought it would, it was his duty to refuse to carry them out; the defendant furnished the entity—the shovel and operator—to the Highway Department for an hourly consideration of $6.75; the Highway Department could have dispensed with the services of the entity, but it could not have discharged the operator and substituted another operator of its own choosing.

When these factors are given due consideration, I am of the opinion that the question of whether Jones was the servant of the defendant at the time plaintiff suffered his injuries was properly submitted to the jury, in the absence of a motion for the court to instruct the jury that Jones was the servant of the defendant. I am not sure that it would not have been the duty of the court to hold as a matter of law that Jones was defendant's servant, if plaintiff had so requested.

Under the facts established by the evidence it was necessary that the representatives of the Highway Department point out to the operator the work to be done and give signals and directions as to details of the work and the manner of doing it, and it was necessary that the operator co-operate with representatives of the department. But such co-operation did not constitute control so as to relieve the defendant from liability. 39 C. J. 1275. From the testimony of the maintenance engineer in charge for the Highway Department it is clear that he understood that there was co-operation between Jones and the Highway Department, but he did not understand that Jones was under the control of the department.

In addition to the foregoing authorities, see, also, Restatement, Agency, § 227; 39 C. J. 1275; 35 Am. Jur. 455; Standard Oil Co. v. Anderson, 212 U. S. 215, 29 S. Ct. 252; Charles v. Barrett, 233 N. Y. 127, 135 N. E. 199; Bartolomeo v. Charles Bennett Contr. Co., 245 N. Y. 66, 156 N. E. 98; Wagner v. Larsen, 174 Wis. 26, 182 N. W. 336; Densby v. Bartlett, 318 Ill. 616, 149 N. E. 591, 42 A. L. R. 1406, and note; Moss v. Chronicle Pub. Co., 201 Cal. 610, 258 P. 88, 55 A. L. R. 1258, and note; Ramsey v. New York C. R. Co., 269 N. Y. 219, 199 N. E. 65, 102 A. L. R. 511, and note.

The majority opinion relies strongly on McFarland v. Dixie Machinery & Equipment Co., 348 Mo. 341, 153 S. W. 2d 67, 136 A. L. R. 516. While that case and the present case contain some features that are quite similar, yet I believe there are enough differences in the facts to distinguish the cases. There the operator of the machinery was instructed by the owner of the machine "that he would receive his orders from those in charge of the project," and the person in charge of the work for the WPA testified that he had exclusive supervision over the equipment and the work. There is testimony that the operator was told to do what the foreman wanted done "outside of jeopardizing the machine itself, like running in the river, which they did a few times." The Missouri court does not consider this warning as other than an admonition to be careful with the machinery. In that case the first borrower of the machinery understood that it had such complete control over the machinery and operator that it could lend the same to a third party, which it did. Here the contract between the defendant and the Highway Department is silent on the question of control of the shovel. The engineer of the Highway Department testified:

"Q. Did your department or anybody connected with the department assume supervision, any more supervision over the operation of the trucks and the man of the shovel than to point out where this dirt was to be taken from and where it was to be loaded? A. Not only in a co-operative way. The operation of the shovel, of course, was up to the man that was on and Mr. Baxter would keep everything going. The operation, of course, of the shovel is in the hands of the operator . . . Q. And you didn't have any authority over the machine or control of him or how it was operated, did you? A. Well, only to this extent, I would say: As long as that machine was getting that dirt out economically and co-operating with us in doing that kind

of a job, why . . . Q. Then you were satisfied? A. Yes, sir. Q. And when it happens that wasn't done, then the only authority you had was to complain to the Wylie-Stewart Machinery Company, wasn't it? A. Yes, sir."

I think this testimony, along with the instructions to the operator, above quoted, make it clear that the defendant did not surrender absolute control of the shovel and operator, and all parties so understood it.

For the foregoing reasons, I respectfully dissent.

DAVISON and ARNOLD, JJ., concur in this dissent.