HODGES et al. v. HOLDING.

No. 33909.   Feb. 27, 1951.

Rehearing Denied April 3, 1951.

*229 P. 2d 555.*

Butler & Rinehart, Oklahoma City, for plaintiffs in error.

Monnett, Hayes & Brown, Oklahoma City, for defendant in error.

HALLEY, J. Section 44, Title 85, O. S. 1941, provides that where a workman, entitled to compensation, is injured "by the negligence or wrong of another not in the same employ," he may elect to accept compensation or to pursue his common-law remedy for damages against the party injuring him, and against the employer of such party, under the doctrine of respondeat superior. Wylie-Stewart Machinery Co. v. Thomas, 192 Okla. 505, 137 P. 2d 556.

The plaintiff, L. N. Holding, was a driller's helper employed by Sherin & Son, drilling contractors, who had contracted with Sohio Oil Company to deepen a high-pressure flowing well in Garvin county. Sherin & Son had employed Hodges & Nolen, trucking contractors, to move their drilling rig to the well to be deepened, and it had been unloaded around the well within a radius of a few hundred feet. The moving of the rig had been completed. It was charged for on a mileage-weight basis. Some of the machinery and equipment of the drilling rig was too heavy to be handled by hand, and Sherin & Son, having no trucks of their own, made an oral agreement with Hodges & Nolen to leave one of their trucks, equipped with winch and gin pole, and with two truck operators, at the well to assist the drilling crews in rigging up for deepening the well.

Elmer Spurgeon, tool pusher for Sherin & Son, was in charge of the rigging-up operations and had under his supervision three drillers, who had four helpers each. Hodges & Nolen sent Dewey Isabell and Lee McBride to assist in the rigging-up work as truck driver and helper. The truck and its equipment were owned by Hodges & Nolen and operated at their expense. Sherin & Son agreed to pay for the truck and its two operators on an hourly basis.

Lee McBride, employed by Hodges & Nolen as a helper of their truck driver, was also an experienced truck driver. Dewey Isabell, as truck driver,

had authority to direct McBride to drive the truck or to assist in its operation. Their principal work consisted of moving the drilling equipment from its location around the well up to the well, and unloading it wherever directed by the drillers or tool pusher. These employees of Sherin & Son had authority to say when certain equipment was to be moved and where it was to be placed.

On May 15, 1947, Lee McBride was driving the truck. It was near the well when one of the drillers directed him to bring up to the well certain equipment located a few hundred feet south of the well. McBride turned the truck and started to back toward the ordered equipment. L. N. Holding was walking in the same general direction, and the truck backed into him, causing the injuries complained of.

At the time of the accident, McBride was a regular employee of Hodges & Nolen, who paid his wages, carried Workmen's Compensation insurance for him, and deducted Social Security taxes from his wages. L. N. Holding bore the same relation to Sherin & Son. All of the foregoing facts are well established.

The plaintiff, Holding, claims that he was not in the same employ as Lee McBride at the time of the injury and therefore had the right to elect to sue McBride's employer, Hodges & Nolen, for damages instead of accepting compensation from his own employer. He was clearly entitled to compensation. Hodges & Nolen contend that the plaintiff was not entitled to sue for damages because the plaintiff and McBride were in the same employ. This contention is based upon the theory that McBride was a loaned servant of Sherin & Son and therefore a fellow-servant of the plaintiff, Holding, who was admittedly a regular servant of Sherin & Son, and that his sole remedy was under the Workmen's Compensation Law.

There is no dispute but that if plaintiff, Holding, and Lee McBride, the driver of the truck, were in the same employ at the time of the accident, this action for damages must fail. These parties were admittedly general servants of different employers. Whether or not Lee McBride was a loaned servant of Sherin & Son at the time of the accident is the decisive issue involved.

This question was submitted to the jury. The verdict for the plaintiff impliedly found that McBride was not a loaned servant of Sherin & Son. The general rule relative to loaned servants is clearly set out in the syllabus of Wylie-Stewart Machine Co. v. Thomas, supra, as follows:

"1. It is well settled that one who is the general servant of another may be loaned or hired by his master to another for some special service so as to become, as to that service, the servant of such third person.

"2. Servant lent by master to another for particular employment, although remaining general servant of master, must be dealt with as servant of one to whom he is lent, as regards anything done in the latter's employment.

"3. To impose liability on general master for servant's acts on theory of respondeat superior, master must have power of controlling servant as proprietor, in sense of being able to stop work or to continue it, and to determine way in which work shall be done with reference to method of reaching result, not merely result.

"4. In determining whether general master of servant or person to whom servant was lent is liable for servant's acts, neither payment of wages nor power to hire and discharge is controlling."

Hodges & Nolen set out in their brief that there are a large number of factors to be considered in determining when a general employee of one employer becomes a special or loaned servant of another. Some of these factors should be given greater weight than others. A number of cases from

this and other jurisdictions are cited, but the exact state of facts here presented is not found in the cited cases. However, a state of facts very similar to that here presented is found in City of Tulsa v. Randall, 174 Okla. 630, 52 P. 2d 33, where the general rule is announced in the second syllabus as follows:

"Where a servant is under the control and subject to the orders of the master and under his employ, owes obedience to such master, and is ordered by such master to assist a third person to do a piece of work, and while so doing he remains under the control and subject to the orders of his master, he does not in such case become the servant of such third person, but remains the servant of his master."

In the body of that opinion, the court quotes from New v. McMillan, 79 Okla. 70, 191 P. 160, as follows:

" 'In cases like the one at bar, where it was agreed that the relation of master and servant had existed but where there is an issue as to whether such relation had ceased and been transferred to a third person, a reasonable test, and it seems to us the real test, in such case, is whether or not the servant by mutual agreement terminated the employment, ceased to be under the control and subject to the orders of his former master, renounced further obedience to such master, and knowingly and willingly subjected himself to the orders of another, under a new contract with a new master. Likewise, the test as to a third person's liability for injuries caused by the acts of such servant depends upon whether the master has relinquished all control over the servant or still retains a general contract over him, and, where only partial contract is exercised by such third person, he cannot be held liable for the acts of such servant.' "

It is clear, from a careful review of the evidence, that Hodges & Nolen did not relinquish completely their authority over the truck operators when they directed them to assist Sherin & Son in the work of rigging-up. They were told to report to the well and assist in

this work. No definite time was or could be fixed for the completion of this task. Sherin & Son knew when certain equipment was needed and where it was needed. To that extent they had the authority to give orders to the truck driver and his helper. Sherin & Son clearly did not have the authority to tell Hodges & Nolen's men how to drive the truck or how to use the winch or gin pole. They did have the authority to give directions as to the results to be attained. That is, they ordered certain materials when needed, and had a right to say where they were to be unloaded from the truck, but they did not have the authority to direct the truck drivers as to the manner and method to be employed by them in accomplishing the desired results. Sherin & Son did not order any particular driver or helper to operate the truck. Hodges & Nolen could have replaced these men with other employees. This is but another evidence of the fact that Hodges & Nolen did not relinquish complete control over their regular employees, who were assigned on a job lasting only a few days. The work they were to perform was part of the regular business of Hodges & Nolen, the operation of the truck and its equipment. It was no part of the regular business of the drilling contractors, Sherin & Son. The truck operators did no part of the work of rigging-up except that which they did with the truck and its equipment. It is not shown that those in charge of the work for Sherin & Son could have operated a truck, winch, or gin pole. No employee of Sherin & Son told McBride how to reach the equipment he had been ordered to bring to the well, and for which he had started when the accident occurred. They neither told him to drive forward nor to back down to where he was to pick up the materials they wanted brought up to the well. Thomas A. Perdue, one of the drillers, was asked:

"Q. Did the truck driver, Lee McBride, or the truck driver, Dewey Isa-

bell, do any work in the rigging-up operations at this well other than their work with the use of the truck? A. No."

This testimony is not contradicted, and shows that the work being done by McBride in the rigging-up operation was that of a truck operator, the regular business of his regular employer. Mr. Nolen testified that he had hired McBride, and that before the accident he had promised him a job as a truck driver as soon as he had an opening. This indicates that he could have replaced McBride as a helper at any time he desired. His services had not been requested by Sherin & Son, and Hodges & Nolen could have replaced him with another employee.

William J. Rhodes, another driller for Sherin & Son, testified as follows:

"Q. Did this particular truck involved in this accident participate in the moving of the rig and the equipment? A. Yes, sir.

"Q. During any of this rigging-up operations, either on the day of the accident or before that day, did you at any time direct this regular truck driver, or the truck driver's helper, how, or in what manner to, or how to drive or operate the truck? A. I sure did not.

"Q. Did you tell the truck driver or his helper how to do their work? A. No, that is not oil fielding.

"Q. Did you tell them how to operate or drive the truck on that job? A. Heck, no, I did not.

"  . . .

"Q. But you did not tell them how to get the job done? A. No, I did not, that was up to them, I told them to put it where I wanted it, I would tell them where to put it.

"  . . .

"Q. At this particular job at the time of the accident, did you have the right to tell the swamper if he should drive a truck or the regular truck driver should drive? A. No, I did not.

"Q. Did you ever tell the truck driver or swamper which one to operate or drive the truck? A. No, I did not."

W. C. Millson, an employee of Sherin & Son, testified for the plaintiff as follows:

"Q. And as to the way the swamper or the driver would operate the truck, did Sherin & Son attempt to tell them about that? A. No, sir; it didn't make any difference, just so the driver got it done.

"Q. All that Sherin & Son were interested in was getting the job done, is that right? A. That's right.

"Q. And not in the details as to how that truck driver and his swamper got it done? A. No, sir.

"Q. They were not interested in that? A. No, sir.

"Q. Did Sherin & Son at any time tell them how to operate that winch and the gears that operated it, and so forth? A. Well, other than just telling them, if he had the winch tied over some object, they might tell him to pick it up a little higher or let it down, or whatever they wanted done with it."

The last testimony quoted is perhaps the strongest evidence that Sherin & Son exercised any control over the manner and method of work being done by the truck operators. Mr. Sherin, employer of the plaintiff, testified:

"Q. Did he have the right to tell them which one of the men should drive the truck, or which one should swamp or help? A. No, sir.

"Q. Or how to handle the winch and equipment on the truck? A. I never heard of such a thing; no, sir.

"Q. Or how to drive the truck? A. No."

Hodges & Nolen contend that the question of whether or not McBride was a loaned servant was a question of law for the court, and that it was error to submit that issue to the jury. They demurred to the plaintiff's evidence, moved for a directed verdict, and for judgment non obstante veredicto, and filed a motion for new trial, in which this same contention was urged. The correct rule on this question is an-

nounced in City of Tulsa v. Randall, supra, as follows:

"When a master seeks to defend against the negligence of his servant upon the theory that the servant has been loaned to a third person, who was for the time being his master, a question of fact is presented for determination of the jury upon proper instructions."

In the body of that opinion, the court quoted from 39 C.J. 1274 as follows:

" 'To escape liability the original master must resign full control of the servant for the time being, it not being sufficient that the servant is partially under the control of a third person; and it is necessary to distinguish between authoritative direction and control and mere suggestions as to details or the necessary cooperation where the work furnished is part of a larger operation. A servant of one employer does not become the servant of another for whom the work is performed merely because the latter points out the work to the servant, or gives him signals calling the service into activity, or gives him directions as to the details of the work and the manner of doing it.' "

The same idea has been expressed in 35 Am. Jur., Master and Servant, §541, p. 971, as follows:

"To escape liability, the original master must have resigned the full control of the servant for the time being; it is not sufficient that the servant was partially under the control of another. If he does not surrender full control over the servant, he remains liable for his negligence during the time he acts for the person to whom he is loaned."

A careful review of all of the evidence convinces us that the trial court was justified in submitting the loaned-servant question to the jury. No exceptions are urged to the court's instructions. The verdict of the jury is supported by competent evidence, and the judgment based thereon is therefore affirmed.

LUTTRELL, V. C. J., and CORN, DAVISON, and O'NEAL, JJ., concur.

ARNOLD, C.J., and GIBSON, JOHNSON, and WELCH, JJ., dissent.