**CHEROKEE LINES, INC., Petitioner,**

v.

**Dillard F. BAILEY, Truckmen, Inc., and the Workers' Compensation Court, Respondents.**

**No. 76673.**

Supreme Court of Oklahoma.

Sept. 21, 1993.

---

Paul V. McGivern, Jr., Daniel L. Crawford, McGivern, Scott, Gilliard, McGivern & Robinson, Tulsa, for petitioner.

David P. Reid, Ash, Crews & Reid, Tulsa, for respondents.

SIMMS, Justice:

Cherokee Lines, Inc. (Cherokee), petitioner herein, requests this Court to review the order of the Workers' Compensation Court which found that the court had jurisdiction to adjudicate the workers' compensation claim of Dillard F. Bailey, respondent. The Court of Appeals affirmed the order of the Workers' Compensation Court. Certiorari was granted to determine whether Cherokee Lines, an Oklahoma trucking company, was the employer of Bailey when he was injured in Georgia. Because we find that Cherokee Lines was not Bailey's employer, we vacate the opinion of the Court of Appeals, reverse the order of the Workers' Compensation Court, and remand this cause with directions to dismiss Bailey's claim.

"When the existence of the employer-employee relationship is an issue before the Workers' Compensation Court, a jurisdictional question is presented and the Supreme Court on review will not accept findings of the court as conclusive, but will weigh evidence contained in the record and independently evaluate law and facts to determine the existence or absence of the relationship." *Beall v. Altus Public School Dist.*, 632 P.2d 400, 401 (Okla.1981). *See also Osmus v. City of Oklahoma City*, 568 P.2d 1259 (Okla. 1977) and *Brewer v. Bama Pie, Inc.*, 390 P.2d 500 (Okla.1964).

Bailey went to the offices of Cherokee Lines in Cushing, Oklahoma in late December, 1989. Bill Orr, the safety director and truck driver recruiter for Truckmen, Inc., administered a written test for truck drivers and a driving test to Bailey. Truckmen is a labor service company that specializes in recruiting truck drivers and leasing them out to long haul trucking companies such as Cherokee Lines. When Truckmen recruits truck drivers in Oklahoma, they offer two options to the drivers.

The options were explained at trial by Charles Cline, the operator of Cherokee Lines, and Robert Beaver, the president of Truckmen. Each of these men testified that the first option is for the truck driver to drive his own vehicle to Chattanooga, Tennessee, and go through the testing and screening process. If approved by Truckmen, then the driver is hired, required to sign an employment agreement, and leased to a trucking company. Under the second option, which Bailey chose, the driver is screened and tested at the Cherokee Lines offices in Oklahoma by Orr. If approved by Truckmen, then the driver is presented to Cline to see if he will approve the driver to be leased to Cherokee Lines. If so, the driver is hired by Cherokee Lines as a temporary employee until he reaches Tennessee where he resigns from Cherokee Lines and is hired by Truckmen.

The parties stipulated that Bailey was initially hired by Cherokee Lines while he was in Oklahoma. On January 4, 1990, Bailey rode in a Cherokee Lines truck with another driver to California. They then drove to Chicago where Bailey was assigned a truck bearing the Cherokee Lines logo. From there, Bailey drove the truck "solo" to Chattanooga, Tennessee, arriving on January 12, 1990. On that date, he signed a letter of resignation from employment with Cherokee Lines and executed an employment agreement with Truckmen. This employment agreement emphasizes that no other employer/employee relationship existed other than his with Truckmen and that Tennessee would be the forum for

the resolution of any workers' compensation claims.

Both Cline and Beaver testified that Bailey was an employee of Truckmen upon signing the agreement. Cline stated that Cherokee Lines does not employ permanent drivers of its own, but rather, leases drivers from Truckmen to operate their trucks. It is undisputed that Bailey drove a Cherokee Lines truck, kept his records in a Cherokee Lines driving log, and called the Cherokee Lines dispatcher twice a day. Cline and Beaver explained that the truck belonged to Cherokee Lines and that the driving log had to be under Cherokee Lines' name because Cherokee Lines had authority to haul certain goods regulated by the Interstate Commerce Commission (ICC) across state lines. Under U.S. Department of Transportation regulations, the common carrier, Cherokee Lines, had to keep driving logs that designate Cherokee Lines as the trucking company with the ICC authority. Since Truckmen only leases truckers and does not have authority from the ICC to haul certain goods, Truckmen does not provide a driving log with its name on it.

Cline further explained that the truck drivers who are driving their trucks call Cherokee Lines dispatchers to report the temperature of the load, what the load is, where they are going with it, and when they anticipate they will arrive at their destination. This information was apparently important because much of Cherokee Lines' business was hauling candy for M & M/Mars Candy Company. Moreover, messages to the drivers from customers, Truckmen, and even the truckers' spouses were relayed through the "message center," the designation Cline gave to the dispatchers.

Beaver stated that Truckmen also dispatched the drivers to Georgia, Tennessee and Alabama when Beaver or his assistant, Steve Tuton, found a load for them to haul. In fact, evidence indicated that Truckmen, and not Cherokee Lines, dispatched Bailey to Georgia where he was injured on January 23, 1990. However, Bailey testified that Cherokee Lines dispatched him to Georgia for that load.

The arrangement between Cherokee Lines and Truckmen also included Cherokee Lines issuing a credit card to the Truckmen drivers to use in purchasing fuel, oil and other items necessary for the truck and to get cash advances to pay for meals, motels and other personal expenses. Each week, the driver was to send the receipts for these expenses to Cherokee Lines. Cherokee Lines then pays Truckmen for the use of the drivers and subtracts the credit card charges from this payment. In turn, Truckmen pays the drivers for their work. Moreover, Truckmen is responsible for withholding federal income taxes and social security taxes as well as providing benefits such as hospitalization insurance to the drivers. Truckmen also has workers' compensation insurance covering the drivers throughout the United States.

Bailey testified that he thought that he was working for Cherokee Lines. He based this primarily upon the fact that he was driving a Cherokee Lines truck. He further stated that he thought Orr, who hired him, worked for Cherokee. He then clarified this statement by saying that he understood Orr was "working hiring employees for Cherokee." Additionally, he explained that he signed the resignation letter and employment agreement because he was instructed to sign them by Orr when he arrived at the Truckmen office in Tennessee.

Contrary to his testimony that he was working for Cherokee Lines, Bailey admitted that when he got to the Truckmen office in Tennessee, they told him he was going to work for Truckmen. He further admitted that when he signed the resignation letter he understood that he was resigning from Cherokee Lines and when he signed the employment agreement, he understood that he was being hired by Truckmen.

Cline stated that Cherokee Lines paid Bailey for the few days he was temporarily working for him. However, Bailey has never been paid by either Truckmen or Cherokee Lines for driving he did after

January 12, 1990. Beaver explained that Bailey has not been paid because Bailey had drawn more cash advances on the Cherokee Lines credit card than he had coming to him in salary.

Finally, the parties disagreed as to how Bailey lost his job. Bailey said that Cline fired him during a phone call he made to Cline when he returned to his home in Oklahoma. Cline stated that he told Beaver that Bailey was not to drive a Cherokee Lines truck because Bailey was involved in a traffic accident. In a letter to Bailey's attorney, Cline stated that "Truckmen, Inc. terminated Mr. Bailey because we instructed them to." Cline testified that this did not mean that Cherokee Lines told Truckmen to fire Bailey, but rather, it meant that Bailey was "terminated" from driving a Cherokee Lines truck. Cline and Beaver agreed that Cherokee Lines had no authority to fire Bailey from Truckmen; Cherokee Lines could only request that a driver not be assigned to their trucks. Indeed, *Beaver testified that Bailey was never fired by Truckmen.* Rather, Bailey "faded into the woodwork" and took a job with another trucking company. Beaver has tried to contact Bailey, but has not met with success.

██ Although the Workers' Compensation Act is to be construed liberally in favor of workers it is intended to benefit, Bailey must be held to strict proof that he was an employee of Cherokee Lines in order to be covered by the provisions of the Act. *Beall,* 632 P.2d at 403. An employer-employee relationship "is created by contract, either express or implied, or by the unequivocal acts of the parties recognizing the relationship." *Id.,* at 402 (quoting *Landrum v. Ownby,* 290 P.2d 400 (Okla. 1955). Under 85 O.S.1981, § 4, the Workers' Compensation Court does not have jurisdiction to hear a workers' compensation claim for injuries sustained outside of the State of Oklahoma unless his contract of employment was entered into within the state. *Chapman v. Union Equity Cooperative Exchange,* 451 P.2d 3 (Okla.1969); *Hartford Ins. Group v. McDaniel,* 526 P.2d 941 (Okla.1974). Generally, "a contract is deemed to have been made where the final assent is given." *Chapman,* 451 P.2d at 5. *See also Armstrong v. Guy H. James Construction Co.,* 402 P.2d 275 (Okla.1965).

██ Upon our review of the record, we find the evidence indicates that Bailey was hired by Cherokee Lines while in Oklahoma. He remained a Cherokee Lines employee for a short time, but resigned from that employment on January 12, 1990. On that date, Bailey entered into an employment relationship with Truckmen in the state of Tennessee by executing a contract of employment with Truckmen. Final assent was given when Bailey signed the employment agreement in Tennessee. Bailey's employment with Truckmen continued until the time of the accident in Georgia. Because neither the injury occurred nor the employment contract was entered in the state of Oklahoma, the Workers' Compensation Court had no jurisdiction over Bailey's claim.

██ However, Bailey argues the trial court correctly found that it had jurisdiction because Bailey was an employee of Cherokee Lines under the loaned servant doctrine. The order of the trial court specifically states that Cherokee Lines "continued to exercise control over [Bailey's] duties as a truck driver" after he signed the documents and that Bailey was an employee of Cherokee Lines at the time of his injury. This ruling suggests that the trial court thought that Bailey was a loaned servant of Cherokee Lines. Indeed, the Court of Appeals held such. However, the trial court made no specific finding that the loaned servant doctrine applied. Because no finding was made, we will not review the record to determine whether competent evidence exists to support the loaned servant doctrine. Rather, we make an independent review of the facts to determine whether Bailey is a Cherokee Lines employee under that theory.

"The 'loaned servant' doctrine is, in brief, the rule that one who is the general servant of another may be loaned or hired by his master to another for some special service so as to become, as to that

service, the servant of such third person." *Ishmael v. Henderson,* 286 P.2d 265, 268 (Okla.1955).

▉ To determine whether a claimant in a compensation case is a loaned servant, the key is to ascertain whether the act which the claimant was performing when injured was part of the regular business of the temporary employer and subject to the latter's direction as to the details of the act. *Tulsa Rig, Reel & Mfg. Co. v. Millsap,* 619 P.2d 625, 628 (Okla.1980). The right to discharge the employee or the obligation to pay his wages are merely indicia of the control and are not exclusively determinative of the question. *Id.*

The application of the loaned servant doctrine is questionable in this case because a break in the chain of "employment" with Cherokee Lines occurred. There is no doubt that Bailey was employed by Cherokee Lines up until January 12 when he resigned by letter. Bailey asserts that after that date, "the unequivocal acts" of Cherokee Lines and himself "recognized" an employment relationship in that he was performing work which was a regular part of Cherokee Lines' business. However, Bailey misconstrues the reach of the loaned servant doctrine. He appears to argue that jurisdiction in the Oklahoma Workers' Compensation Court arose because he was a loaned servant. Such use of the doctrine finds no basis in case law.

▉ The loaned servant doctrine merely allows an injured worker to bring a claim against either his actual employer or the secondary employer to whom he was loaned. *It does not create jurisdiction.* The Workers' Compensation Court is a "statutory tribunal of limited jurisdiction and has only such jurisdiction as is conferred by law." *Cities Service Gas Company v. Witt,* 500 P.2d 288 (Okla.1972). Such jurisdiction is only proper in Oklahoma when the injury occurs in Oklahoma or the employment contract is entered in Oklahoma. 85 O.S.1981, § 4; *Chapman, supra.* Without jurisdiction to hear the claim, the Workers' Compensation Court has no occasion to apply the loaned servant doctrine. In fact, in all of the workers' compensation cases in which this Court has applied the loaned servant doctrine, jurisdiction was proper in Oklahoma because either the injury occurred or the employment contract was entered within the state.

No evidence was presented to even suggest that an employment contract was entered in Oklahoma on the basis of work performed by Bailey for Cherokee Lines and under the direction of Cherokee Lines. The evidence established that after Bailey resigned from Cherokee, he entered into an employment agreement with Truckmen in Tennessee. Truckmen in turn leased him to Cherokee Lines and required him to submit to instructions given by either Cherokee Lines or Truckmen. After the resignation, no employment contract was entered into with Cherokee Lines in the State of Oklahoma, either express or implied or by the unequivocal acts of the parties recognizing an employment relationship. Although Bailey may have been leased/loaned to Cherokee Lines by Truckmen, his employer, no contract of employment was entered into in Oklahoma. Thus, the Oklahoma Workers' Compensation Court did not have jurisdiction over his claim.

The opinion of the Court of Appeals is VACATED, the order of the Workers' Compensation Court is REVERSED, and this matter is REMANDED with directions to dismiss the workers' claim for lack of jurisdiction.

HODGES, C.J., LAVENDER, V.C.J., and HARGRAVE, ALMA WILSON, KAUGER, SUMMERS, and WATT, JJ., concur.

OPALA, J., dissents.