1998 OK CIV APP 137

**OKLAHOMA DEPARTMENT OF TOUR-ISM and the State Insurance Fund, Petitioners,**

v.

**Larry WILLIAMS, Oklahoma Department of Public Safety, The State Insurance Fund and The Workers' Compensation Court, Respondents.**

No. 90193.

Court of Civil Appeals of Oklahoma, Division No. 3.

May 19, 1998.

Rehearing Denied June 23, 1998.

W. Jeffrey Dasovich, Dasovich Law Office, Oklahoma City, for Petitioners.

Robin Cox Cusack, Huddleston, Pike & Associates, Oklahoma City, for Respondents.

## MEMORANDUM OPINION

ADAMS, Judge.

¶ 1 Claimant Larry Williams was a seasonal park ranger employed at Foss Park by the Oklahoma Department of Tourism (Tourism, collectively with its insurer, the State Insurance Fund). On the day in question, his work shift had not yet begun when he responded, in his private pick up truck, to a radio call for assistance from a Custer County deputy sheriff who had been fired upon by two escapees from the state prison at Granite, Oklahoma. Prior to responding to the call for assistance, he telephoned the park offices and tried to contact the park manager, the other park ranger, and the third person in command. When none was available, he advised the secretary about what was occurring and drove towards Foss Lake. Claimant went past the park offices and saw other law enforcement officers pursuing the escapees. The chase was heading toward the park. He turned and traveled parallel to the chase. He continued until he reached an intersection near the park's north entrance where a state highway and a county road, which border the park, cross.

¶ 2 The escapees, who by this time reportedly had run through several road blocks, were being pursued by law enforcement officers who had responded from Roger Mills County, Washita County, Dewey County, Department of Corrections, Clinton Police Department, Oklahoma Highway Patrol, and other agencies. They came through the intersection and turned towards the town of Butler, Oklahoma. Claimant let the pursuing sheriff and other officers pass, and then joined the end of the line following the escapees. He drove into Butler and there saw a highway patrolman getting gas at a convenience store. He pulled into the station, realized he knew the patrolman, and asked if he could ride with him and another patrolman (a trainee) in the car. After receiving permission, Claimant rode in the rear seat.

¶ 3 The chase proceeded for several miles. Aircraft reports on the radio stated that the escapees were running through roadblocks and firing at officers. Claimant realized the escapees' route of travel from the descriptions on the radio and directed the patrolmen to an intersection. The patrolmen and Claimant stopped at the intersection. Claimant asked the patrolmen if he could use the rifle in the car and was told that he could use it. He also asked the patrolmen if they wanted the escapees' "vehicle stopped or taken out" and received an affirmative response. He took cover near another law enforcement unit at the intersection and, when the escapees approached, fired shots at their radiator. As the escapees went by, he duck, pivoted, and fired again, this time at the tires. He hit both tires on the side of the fleeing vehicle and · the escapees then crashed into a bar ditch. He injured his left foot when he pivoted. · He filed this workers' compensation claim against Tourism.

¶ 4 At the hearing on temporary total disability and permanent partial disability, Tourism contended that Claimant's injuries did not arise out of and in the course of his employment with Tourism and that he was, in any event, a "loaned servant" to the Department of Public Safety (DPS) at the time he was injured. It also took issue with Claimant's view of the rate upon which his benefits should be based.

¶ 5 The Workers' Compensation trial judge found that Claimant was not a loaned servant to DPS at the time of injury and ordered Tourism to pay temporary total disability benefits and permanent partial disability benefits based upon the rate urged by Claimant. Tourism filed an *en banc* appeal, but the three-judge panel found the order

was not against the clear weight of the evidence or contrary to law and, by a divided vote, affirmed.[1] Tourism then filed this review proceeding, arguing that the finding that Claimant was not a DPS employee at the time of the injury was not supported by any competent evidence, and the rate set by the Workers' Compensation Court was similarly in error.[2]

¶ 6 "Whether the loaned servant doctrine applies in a particular case is a question of fact to be determined by the Workers' Compensation Court. If such findings are reasonably supported by competent evidence, they will not be disturbed on appeal." *City Diesel Service v. Collier*, 1981 OK 75, ¶ 5, 630 P.2d 1293, 1294. Applying this standard of review, the existence in the record of evidence from which a contrary conclusion might be drawn is immaterial. *Riley v. Cimarron–Empire Construction Company*, 1966 OK 236, 420 P.2d 550. As in *City Diesel Service*, we review the record on this issue only to determine whether the finding of the Workers' Compensation Court is supported by any competent evidence.[3]

¶ 7 In brief, the loaned servant doctrine provides that one who is the general servant of an employer may be loaned or hired by his master to another employer for some special service so as to become, as to that service, the servant of that other employer. *Ishmael v. Henderson*, 1955 OK 200, 286 P.2d 265. The test for determining whether Claimant was a loaned servant rests upon the amount of control and direction exercised by his employer and the amount of control and direction exercised by the alleged special employer. If an employee, though ordered to assist a third person, remains under the control and subject to the orders of his employer and performs work which is part of the regular business of the employer, the employee does not become the servant of the third person but remains the employee of his employer. *Hodges v. Holding*, 204 Okl. 327, 229 P.2d 555 (1951).

¶ 8 A general or lending employer is not necessarily freed from liability by the act of loaning employees to third parties. The key in determining if an employee/claimant is a loaned servant is to ascertain whether the act performed when the injury occurred was part of the regular business of the temporary employer and subject to the latter's direction as to the details of the act. *Tulsa Rig, Reel & Manufacturing Company v. Millsap*, 1980 OK 165, 619 P.2d 625. The loaned servant doctrine merely allows an injured worker to bring a claim against either his actual employer or the secondary employer to whom he was loaned. *Cherokee Lines, Inc. v. Bailey*, 1993 OK 111, ¶ 18, 859 P.2d at 1111.

¶ 9 While it is true that Claimant asked for permission before riding in the highway patrolmen's car and before using their rifle and he had asked for their preference in managing the actions at the roadblock they had set up, Claimant was *also* performing in conformity with Tourism's policies and procedures. Tourism's policy and procedure manual states:

Official Action While Off Duty

---

1. The dissenting judge stated, "I would modify claimant's compensation rate due to his seasonal employment."

2. Like the trial judge, we are struck by the apparent anomaly of two state agencies, both of whom are merely divisions of the State of Oklahoma whose premium dollars both come from taxpayer money, and are insured by the same "quasi" state entity, litigating the question of which agency will have responsibility for this injury. Perhaps this anomaly partially explains why the attorneys representing Fund, on behalf of DPS, chose not to file a response brief in this proceeding, after requesting leave to do so out of time because they had not received a copy of the brief filed by lawyers representing Fund on behalf of Tourism, and receiving leave to do so.

3. We are not unaware that the Oklahoma Supreme Court made an independent review of the facts concerning the application of the "loaned servant" doctrine, "[b]ecause no finding was made" as to that issue by the Workers' Compensation Court in *Cherokee Lines, Inc. v. Bailey*, 1993 OK 111, ¶ 15, 859 P.2d 1106, 1110. However, *Cherokee Lines* involved the question of whether the claimant was an employee under a contract entered into in Oklahoma, and the Court ultimately concluded that application of "loaned servant" could not create jurisdiction. Accordingly, *Cherokee Lines'* independent review does not signal a retreat from the principles stated in *City Diesel Service*.

Rangers while off duty shall not act in their official capacity,[4] *except in cases of an emergency* or serious crimes involving moral turpitude. *Rangers performing in accordance with this rule while off duty shall govern themselves in the same manner as if they were on duty.* (Emphasis added.)

¶ 10 The policy and procedure manual also provides:

Rangers shall not patrol or execute his/her official office as a peace officer outside the designated boundaries of a property *except when* in pursuit, *at the scene of a felony being committed, or upon request to assist another police officer.* For the purpose of this procedure "request by another officer" shall mean:

\* \* \*

3. When a felony has or is being committed;

(Emphasis added).

¶ 11 The record contains unrebutted evidence that Claimant was a peace officer and was acting as one when injured, that the deputy sheriff had requested assistance after he had been fired upon by the escapees, and that firing upon the deputy sheriff was both a felony and an emergency. Claimant had offered suggestions about the movement of the highway patrolmen's car, not vice versa. His courtesy and cooperation regarding the use and handling of DPS's rifle did not negate the fact that he also was present and assisting in accordance with Tourism policies and procedures in the same manner as if on duty and on park property. Hence, there is competent evidence from which the Workers' Compensation Court could conclude that Claimant had continued to perform within his job with Tourism and not as a loaned servant of DPS.[5]

¶ 12 Tourism next argues that the rate of compensation used to calculate Claimant's benefits was incorrect. We agree. The crux of the problem is a misapprehension of how to calculate the appropriate weekly rate for benefits. Claimant calculated his weekly rate at $249.60, representing a typical four day week times eight hours times a $7.80 hourly rate of pay. Tourism argued that his weekly rate should be set at $81.56, calculated by taking his actual earnings as his annual earnings and dividing by 52. Under Claimant's calculations the benefit rate is the $175 per week used by the Workers' Compensation Court in its order, while under Tourism's calculations the resulting benefit rate was $57.16 per week. Neither calculation is supported by the evidence in this record, if the appropriate law is applied.

¶ 13 Claimant was both a seasonal worker and a part time worker. Consequently, neither 85 O.S.Supp.1992 § 21(1) or (2) properly apply and his benefit rate should have been calculated under 85 O.S.Supp.1992 § 21(3). *J.C. Penney Co. v. Jacobson,* 1970 OK 187, 475 P.2d 391. Under § 21(3), the annual wage is not, as in § 21(1) or (2), based upon *average* annual earnings but upon the annual *earning capacity,* "having regard to the previous earnings of the injured employee and other employees of the same or most similar class, working in the same or most similar environment in the same or neighboring locality."

¶ 14 Claimant was a "999" worker hired to perform for no more than 1000 hours per year, the break point between full time and part time employees. Consequently, his earning capacity per year is limited to no more than 1000 hours times his hourly rate. Claimant, in his appellate brief, argues that "[a]t worst" his weekly wage should be $105.00 ($7.80 per hour times 1000 hours divided by 52 times .70). Tourism, in its appellate brief, agrees this would be his ben-

---

4. Under 74 O.S.1991 § 1811.2(A), commissioned park rangers have "all the powers of peace officers except the serving or execution of civil process, and shall have in all parts of the state the same powers with respect to criminal matters and enforcement of the laws relating thereto as sheriffs, highway patrolmen and police officers in their respective jurisdictions."

5. This same evidence supports the conclusion that Claimant was "in the course of his employment" when injured, an issue raised at trial, but apparently not reargued in Tourism's brief in this review proceeding.

efit rate "[i]f Claimant worked the entire 1,000 hours."

¶ 15 However, Claimant testified that in the two years he had worked as a 999 employee he had not completed the full hours allowed under the contract. The record does not contain any information about how many hours were previously worked by Claimant and by other 999 contract workers (*i.e.*, those in the same or most similar class of employment) working "in the same or most similar environment in the same or neighboring locality." Neither Claimant nor Tourism introduced any evidence of Claimant's actual earnings in the year prior to his injury.

¶ 16 This record does not contain sufficient information for this Court to calculate the appropriate benefit rate under § 21(3). Accordingly, to the extent the order under review imposes a duty upon Tourism to pay Claimant benefits at the rate of $175 per week, the order must be vacated and the matter must be remanded for further hearing to adduce the information required to properly perform this calculation according to the dictates of § 21(3).

¶ 17 The order of the Workers' Compensation Court is vacated insofar as it sets the rate of Claimant's compensation because it is unsupported by any competent evidence under the appropriate law, and the case is remanded for further proceedings to establish a rate in accordance with this opinion. In all other respects, the order is neither contrary to law nor unsupported by any competent evidence, and it is therefore otherwise sustained.

SUSTAINED IN PART, VACATED IN PART AND REMANDED FOR FURTHER PROCEEDINGS.

BUETTNER, P.J., and HANSEN, J., concur.